UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MALA R. CHINOY,                          :
       Plaintiff                         :
                                         :
vs.                                      :   NO. 11-cv-1263
                                         :
                                         :
THE PENNSYLVANIA STATE                   :
UNIVERSITY, *et al.*,                    :
       Defendants.                       :
                                         :

*M E M O R A N D U M*

*I.*       *Introduction*

       Before the Court are motions for summary judgment filed by Plaintiff, Dr.

Mala R. Chinoy (Doc. 53), and Defendants, The Pennsylvania State University ("Penn

State"), the Milton S. Hershey College of Medicine, and four of its employees. (Doc. 45).

Plaintiff filed this civil rights and employment discrimination suit on July 6, 2011.  (Doc.

1).  Plaintiff raises six separate claims stemming from multiple perceived injuries, that

arise from her employment at, and ultimate removal from, Penn State.  For the reasons

that follow, we will grant summary judgment for Defendants.

       Plaintiff filed an amended complaint on November 11, 2011, asserting

claims under 42 U.S.C. § 1983 (Count 1), Title VII of the Civil Rights Act of 1964 ("Title

VII") (Count 2), the Equal Pay Act (Count 3), the Pennsylvania Human Relations Act

("PHRA") (Count 4), Title IX of the Education Amendment Act of 1972 ("Title IX") (Count

5), and a Pennsylvania state law claim for tortious interference with prospective contractual relations (Count 6). (Doc. 12).

On November 23, 2011, Defendants filed a motion to dismiss certain claims in the amended complaint. (Doc. 13). On March 6, 2012, we dismissed the claims against the Board of Trustees, the claims against the individual defendants in their official capacities, and the Section 1983 due process claim. (Doc. 21). We issued a timeliness ruling on Plaintiff's remaining claims.[1] (Doc. 21). Both parties filed motions for summary judgment on September 16, 2013. (Docs. 45, 53). Plaintiff seeks partial summary judgment on Counts 1 through 4. (Doc. 53). Defendant seeks summary judgment on all counts. (Doc. 45). Because we will grant summary judgment for Defendants as to all counts, we will deny Plaintiff's motion for partial summary judgment.

---

1. Per our March 6, 2012 order, (Doc. 21), the following claims were dismissed for timeliness reasons: all claims asserted under Section 1983 based on discrete acts taken by Defendants before July 6, 2009; all claims asserted under Title VII based on discrete acts taken by Defendants before September 1, 2006; all claims asserted under the PHRA based on discrete acts taken by Defendants before January 1, 2007; all claims under the Equal Pay Act based on discrete acts taken by Defendants before July 6, 2008; and all claims asserted under Title IX based on discrete acts taken by Defendants before July 6, 2009.

II.	*Background*

	*A. The Parties*

	The following facts are undisputed unless noted otherwise.[2]  Plaintiff Mala

Chinoy is an Asian female, born in India, who practices Hinduism.  (Doc. 47, ¶ 1; Doc 65,

¶ 1).  She holds a Ph.D in Reproductive Biology.  (Doc. 47, ¶ 2; Doc. 65, ¶ 2).

Institutional Defendants are Penn State and the Milton S. Hershey College of Medicine.

(Doc. 47, ¶¶ 9, 11; Doc. 65, ¶¶ 9, 11).  Individual Defendant Wiley Souba served as the

Chair of the College of Medicine from 1999 until 2006.  (Doc. 47, ¶ 12; Doc. 65, ¶ 12).

Defendant Peter Dillon served as Chief of the Division of Pediatric Surgery from 1996

through 2001, and Interim Chair of the Surgery Department from 2006 to 2007.  (Doc.

47, ¶¶ 18-19; Doc. 65, ¶¶ 18-19).  He was appointed Chair of the Surgery Department in

2007, and he continues to hold this position.  (Doc. 47, ¶ 20; Doc. 65, ¶ 20).  Defendant

Kevin Grigsby began working for Penn State in 2000 as the College of Medicine's Vice

Dean for Faculty and Administrative Affairs, and held this position until 2009.  (Doc. 47, ¶

22; Doc. 65, ¶ 22).  Currently, Grigsby is the Senior Director for Leadership and Talent

Development at the Association of American Medical Colleges.  (Doc. 47, ¶ 24; Doc. 65,

---

2.  While Plaintiff denies several of Defendants' factual contentions, she routinely fails to identify record evidence to contradict Defendants' assertions.  When Plaintiff does point to record evidence, said evidence is often inapplicable to the fact at issue.  Accordingly, these facts will be deemed admitted.  See Local Rule 56.1; Fed. R. Civ. P. 56; Bouriez v. Carnegie Mellon Univ., No. 02-2104, 2005 WL 2106582, at *3 (W.D. Pa. Aug. 26, 2005) ("It has been said, that 'judges are not archaeologists.  They need not excavate masses of papers in search of revealing tidbits–not only because the rules of procedure place the burden on the litigants, but also because their time is scarce.'")(internal citation omitted).

¶ 24).  Defendant Robert Cilley is a professor and Chief of the Division of Pediatric Surgery.  (Doc. 47, ¶¶ 25-27; Doc. 65, ¶¶ 25-27).

### B.  Plaintiff's Employment History at Penn State

Plaintiff was hired by the College of Medicine in 1993 as a non-tenured Assistant Professor in the Department of Cellular and Molecular Physiology.  (Doc. 47, ¶¶ 4, 83; Doc. 65, ¶¶ 4, 83).  Plaintiff understood at the time she was hired that the position was a non-tenured one.  (Doc. 47, ¶ 84; Doc. 65, ¶ 84).  In 1995, she accepted another non-tenured appointment in the Division of Pediatric Surgery.  (Doc. 47, ¶ 94; Doc. 65, ¶ 94).  She continued in the Surgery Department under a series of one-year appointments until September 30, 2007.  (Doc. 47, ¶¶ 97-98; Doc. 65, ¶¶ 94-98).

### 1.  *Plaintiff's Funding History*

The College of Medicine expects faculty members to obtain external grant funding to "support" their salary and the salaries of personnel working in their labs.  (Doc. 47, ¶ 65; Doc. 65, ¶ 65).  A faculty member who prepares a grant application is known as the "Principal Investigator" ("PI") and is primarily responsible for the project if it is funded.  (Doc. 47, ¶ 60; Doc. 65, ¶ 60).  Some grant applications also have co-Investigators, who perform a varied amount of research on the subject project.  (Doc. 47, ¶ 61; Doc. 65, ¶ 61).  It is a "job expectation" that faculty members fund some part of their salary through external grants.  (Doc. 46-73, at 98).

4

From July 1995 through January 2000, Plaintiff submitted 14 grant proposals as a PI. (Doc. 47, ¶ 120; Doc. 65, ¶ 120). Five of the proposals were funded. (Doc. 47, ¶ 121; Doc. 65, ¶ 121). These grants, which were awarded between 1997 and 2000, totaled $572,728.00. (Doc. 47, ¶ 121; Doc. 65, ¶ 121). Plaintiff submitted ten proposals to the National Institute of Health that were all were rejected.[3] (Doc. 46-73, at 135; Doc. 46-70, ¶ 23; Doc. 46-71, ¶ 32).

In July 2002, Plaintiff received a performance evaluation from her supervisor, Defendant Cilley, noting that "[a]n increase in stable long-term extramural funding is needed." (Doc. 47, ¶¶ 128-130; Doc. 65, ¶¶ 128-130). Two years later, Cilley provided another evaluation stating that he was still concerned with Plaintiff's lack of funding, and that if more funding is not secured, her laboratory space would be reduced.[4] (Doc. 46-31 at 2, 4).

Plaintiff had no salary support during academic year 2004-2005, and she was assigned to a smaller lab in the fall of 2005.[5] (Doc. 47, ¶¶ 135-136; Doc. 65, ¶¶

---

3. Plaintiff denies this fact, but fails to properly support the denial. See Note 2, *supra.*

4. Plaintiff denies this fact but fails to properly support it. (Doc. 65, ¶ 133). The actual performance evaluation, which has been placed on the record, confirms Defendants' version of the facts. (Doc. 46-31 at 2, 4).

5. Plaintiff again denies this fact, but fails to properly support the denial. Defendants' exhibits demonstrate that Plaintiff had no external funding during 2004-2005. (Doc. 46-9; Doc. 46-81 (under seal)). Citing her own CV, Plaintiff contends that she had funding through a grant as a co-Investigator. (Doc. 65, ¶ 135). Even accepting this as true, the grant Plaintiff refers to was awarded in February 2005, and supported her salary during the 2005-2006 academic year, *not* 2004-2005. (Doc. 46-81 (under seal)).

135-136).  Plaintiff's prior lab space was assigned to a new hire, Steven Abcouwer, Ph.D. (Doc. 47, ¶ 137; Doc. 65, ¶ 137).  In December 2006, Defendant Dillon became Interim Chair of the Surgery Department and met with Plaintiff to discuss her funding sources. (Doc. 47, ¶ 145, Doc. 65, ¶ 145).  At the time of this meeting, Plaintiff had no grant applications pending.[6]  (Doc. 47, ¶ 148; Doc. 65, ¶ 148).  During academic years 2005-2006 and 2006-2007, Plaintiff's level of salary support from external funding was 6.8% and 5.1%, respectively.[7]  (Doc. 46-72, ¶ 69; Doc. 46-71, ¶ 54; Doc. 46-81 (under seal)). By comparison, another professor in the Surgery Department supported his salary during the same years at 12.2% and 49%, respectively.[8]  (Doc. 47, ¶ 225; Doc.65, ¶ 225).

    In January 2007, Dillon met with Plaintiff again and told her that her appointment would not be renewed when it ended in June 2007.  (Doc. 47, ¶153; Doc. 65, ¶ 153).  This date was later extended to September 2007.  (Doc. 47, ¶ 154; Doc. 65, ¶ 154).  So that Plaintiff could continue assisting a graduate student, she accepted an unpaid adjunct appointment in the Department of Biochemistry and Molecular Biology, effective October 1, 2007.  (Doc. 47, ¶¶ 156-157; Doc. 65, ¶¶ 156-157).  Plaintiff held

---

6.  Plaintiff denies but cites no evidence supporting the denial.  See Note 2, *supra.*

7.  Plaintiff "denie[s] the word 'external.'"  (Doc. 65, ¶ 141).  We do not understand what Plaintiff means by this denial, and the general citation to Plaintiff's own fourteen-page affidavit is equally unhelpful.  Defendants cite to four documents verifying these percentages.  Plaintiff has shown no evidence disputing these facts and we will accept them as true.

8.  Plaintiff denies but cites no evidence supporting the denial.  See Note 2, *supra.*

this position until her affiliation with Penn State ended in December 2009. (Doc. 47, ¶ 159; Doc. 65, ¶ 159).

The parties agree that five other professors lost their external funding at various times during their appointments in the Department of Surgery. (Doc. 47, ¶ 178; Doc. 65, ¶ 178). Of those five professors, three held tenured positions. (Doc. 47, ¶ 180; Doc. 65, ¶ 180). Tenured faculty members are not subject to termination for lack of funding. (Doc. 47, ¶ 182; Doc. 65, ¶ 182). The remaining two professors were selected for other positions after their appointments in the Department of Surgery ended.[9] (Doc. 47, ¶ 185; Doc. 65, ¶ 185).

### 2. *Plaintiff's Salary*

The College of Medicine has no fixed salary schedule and salaries vary widely. (Doc. 47, ¶ 76; Doc. 65, ¶ 76). "[T]o assure salary equity among clinical and basic science employees," the College has conducted several salary studies. (Doc. 56-18; Doc. 56-19 (under seal); Doc. 56-20). In 2004, Plaintiff received a letter from Defendant Grigsby explaining that she would be given a pay increase following a recent study. (Doc. 56-21 (under seal)). The letter stated that Plaintiff's salary would be increased by $12,228, resulting in an adjusted base salary of $114,828. (Id.).

Two years later, in November 2006, Plaintiff emailed Defendant Dillon stating that she believed her salary was still significantly lower than several of her male

---

9. Plaintiff denies but cites no evidence supporting the denial. See Note 2, *supra.*

peers.  (Doc. 47, ¶ 170; Doc. 65, ¶ 170).  The following year, Plaintiff filed complaints

with the Pennsylvania Human Relations Commission ("PHRC"), and the Equal

Employment Opportunity Commission ("EEOC"), alleging that her salary had remained

$114,828 for three years, while other male professors were making over $200,000 a

year.  (Doc. 56-2, ¶¶ 37-39).

The parties agree that only two male faculty members received higher

salaries than Plaintiff:  Dr. Ehrlich and Dr. Scaduto.  (Doc. 47, ¶ 217; Doc. 65, ¶ 217).  Dr.

Ehrlich was an Associate Professor for nearly twenty years at Harvard Medical School

prior to coming to Penn State.[10]  (Doc.46-7; Doc. 46-71, ¶ 49).  While at Penn State, he

was a non-tenured faculty member who was awarded external grants in the amounts of

$600,000, $780,000, and $1.1 million.  (Doc. 47, ¶¶ 205, 222; Doc. 65, ¶¶ 205, 222).  On

average, from 2002 to 2009, over 40% of Dr. Ehrlich's salary was supported by external

funding.  (Doc. 47, ¶ 225; Doc. 65, ¶ 225).  Dr. Scaduto is a tenured professor of Cellular

and Molecular Physiology.  (Doc. 47, ¶ 232; Doc. 65, ¶ 232).  Dr. Scaduto has a dual role

as the IT Director of Research Computing, and as the Director of Education Technology.

(Doc. 47, ¶¶ 233-235; Doc. 65, ¶¶233-235).  He does not conduct research, is not

expected to obtain external funding, and the parties agree that his salary is determined

by the market rate for IT directors at similar universities.  (Doc. 47, ¶¶ 237-238; Doc. 65,

¶¶ 237-238).

---

10.  Plaintiff denies but cites no evidence supporting the denial.  <u>See</u> Note 2, *supra.*

### 3. *Tenure*

In October 1997, Plaintiff contacted her then-Department Chair concerning a promotion, and sought to apply for tenure. (Doc. 47, ¶ 196; Doc. 65, ¶ 196). In November, the Surgery Department's Promotion and Tenure Committee wrote to Plaintiff that "[i]t is the general philosophy of the Department of Surgery that the faculty members with a Ph.D. degree will not be placed on the tenure track." (Doc. 47, ¶ 200; Doc. 65, ¶ 200). Plaintiff was promoted to Associate Professor in July 1998, and in 2003, to Full Professor. (Doc. 47, ¶¶ 114, 116; Doc. 65, ¶¶ 114, 116). Both of these positions were fixed-term, non-tenured positions. (Doc. 47, ¶ 194; Doc. 65, ¶ 194). Under Penn State's Promotion and Tenure Policy, a fixed-term faculty member cannot be promoted to a tenured position, but he or she may apply when an opening is posted. (Doc. 47, ¶ 208; Doc. 65, ¶ 208). Exceptions to this policy can be made, (Doc. 46-64), but in the past, exceptions have been made "infrequently" and only for "highly productive faculty."[11] (Doc. 46-55 at 10).

### 4. *Claims of Religious Harassment and Exclusion from Meetings*[12]

Plaintiff testified at her deposition that during her first two or three years in the Department of Surgery (1995 through 1998), Defendant Cilley pressured her to

---

11. Plaintiff denies this fact but cites no support for this denial. See Note 2, *supra.*

12. Plaintiff testified to these grounds in her deposition, and Defendants agree that she so testified. Defendants do not contest these claims because they oppose them for timeliness.

become a Christian.  (Doc. 47, ¶ 241; Doc. 65, ¶ 241).  Plaintiff stated that after she disregarded Defendant Cilley's comments, the pressure ceased.  (Doc. 47, ¶¶ 242-244; Doc. 65, ¶¶ 242-244).  Plaintiff testified that Cilley later sent two residents to talk to her about Christianity.  (Doc. 47, ¶ 245; Doc. 65, ¶ 245).  Plaintiff also testified that in 2003, when Defendant Cilley became Chief of Pediatric Surgery, he stated that he wanted a white Christian division.  (Doc. 47, ¶ 249; Doc. 65, ¶ 249).  According to Plaintiff, she complained about this harassment to Defendant Souba in 1999 or 2000, and again to a Human Resources Director sometime between 2001 to 2004.  (Doc. 47, ¶¶ 163-164; Doc. 65, ¶¶ 163-164).

Plaintiff testified that she was excluded from Division lunches with outside speakers in 2003 or 2004, and that her areas of research were omitted from Division meeting agendas beginning late 2004 or early 2005.  (Doc. 47, ¶¶ 250, 253; Doc. 65, ¶¶ 250, 253).  Plaintiff stated that she did not attend the meetings initially because "there [was] nothing on [the] agenda for the division which [she was] a part of," and eventually, she stopped receiving the memos altogether.  (Doc. 46-73 at 349-51).  In addition, Plaintiff testified that she was occasionally excluded from parties, but was invited to the Division's holiday dinner every year.  (Doc. 47, ¶¶ 255-256, Doc. 65, ¶¶ 255-256).

*C.  Plaintiff's Applications to Other Positions*

From 2006 to 2012, Plaintiff applied for eleven positions at other hospitals and universities with no success.  (Doc. 47, ¶¶ 260-306; Doc. 65, ¶¶ 260-306).  In 2006, she applied to the University of Iowa but was not selected.  (Doc. 47, ¶ 262; Doc. 65, ¶

262).  Records from Iowa show that interviewers made the following remarks: "she had many interesting stories to tell – unfortunately she was not always willing to listen," and "I must admit by the end of her visit I found her wearing as it was unclear that she wanted to hear about what we were doing."[13]  (Doc. 47, ¶ 267; Doc. 65, ¶ 267).  In 2007, Plaintiff learned that she was not selected for positions at George Mason University, James Madison University, and an Associate Dean position at Penn State.  (Doc. 47, ¶¶ 268, 272, 277; Doc. 65, ¶¶ 268, 272, 277).  Records from Penn State list Plaintiff's application as "no further consideration" and "eliminate."  (Doc. 47, ¶ 279; Doc. 65, ¶ 279).  Also in 2007, Plaintiff learned from the Dean of Penn State's School of International Affairs that she had been removed from the Faculty Governing Council (which she had been appointed to a few months earlier) because Defendant Grigsby told him that Plaintiff had "resigned" from Penn State.  (Doc. 47, ¶ 312; Doc. 65, ¶ 312).  Plaintiff's position on the Council was a joint appointment, and in order to maintain it she was required to be contemporaneously employed in another department at Penn State.  (Doc. 62-4, ¶ 11).

Plaintiff was rejected from positions at Johns Hopkins and Massachusetts General Hospital in 2008, and from Marywood University in 2009.  (Doc. 47, ¶¶ 283, 286, 289; Doc. 65, ¶¶ 283, 286, 289).  In 2010-2011, she was passed over for positions at Central Michigan University, Boston University, and the University of New England.  (Doc. 47, ¶¶ 291, 297, 302; Doc. 65, ¶¶ 291, 297, 302).  Boston University's records show that Plaintiff was ranked "0" and interviewers noted that she was "not a good

---

13.  Again, Plaintiff denies this fact but fails to support the denial.  <u>See</u> Note 2, *supra.*

candidate," and was "long-winded in her answers." (Doc. 46-60). Similarly, interviewers at New England wrote that she was "totally unqualified for the position," as well as "a poor listener" who "often answers her own questions rather than those asked of her." (Doc. 46-61). Last, Plaintiff learned in 2012 that she was not selected for a position at Arcadia University. (Doc. 47, ¶ 306; Doc. 65, ¶ 306).

### D. The PHRC/EEOC Complaint

In July 2007, seven months after learning that her appointment in the Department of Surgery would not be renewed, Plaintiff filed complaints with the PHRC and the EEOC. (Doc. 47, ¶¶ 171-172; Doc. 65, ¶ 171-172). Plaintiff asserted claims for discrimination, harassment, and retaliation on the basis of race, ethnicity, ancestry, color, religion and sex. (Doc. 56-2). Specifically, Plaintiff alleged that she had been pressured to convert to Christianity, that she had received unequal pay, that she had been passed over for tenure for discriminatory reasons, and that she had been retaliated against for complaining about her pay. (Doc. 56-2).

### III.    Discussion

### A. Standard of Review

We will examine the motion for summary judgment under the well-established standard. Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d. Cir. 2008) ("Summary judgment is only appropriate if there are no genuine issues of material fact."). We "must view all evidence and draw all inferences in the light most favorable to

the non-moving party," and we will only grant the motion "if no reasonable juror could find for the non-movant." Id. If the moving party demonstrates that no genuine issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine issue for trial. Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party.'" Roth v. Norfalco, 651 F.3d 367, 373 (3d Cir. 2011) (citing Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011)).

## B.  Section 1983 (Count 1)

Plaintiff alleges that Defendants violated her Fourteenth Amendment right to equal protection.  (Doc. 12, ¶¶ 62, 65).  The amended complaint broadly states that Plaintiff was denied "equal protection, equal opportunity, and equal conditions of employment."  (Doc. 12, ¶ 65).  It is difficult to determine from the pleadings which actions Plaintiff claims violated her rights.  For the purposes of this motion, Defendants have assembled a number of claims from the pleadings, and move for summary judgment thereon.  Defendants assume that Plaintiff is challenging the following actions: "her tenure denial, salary, non-renewal, discontinuance of compensation and contractual interference."[14]  (Doc. 48 at 9).  Defendants argue that the majority of these claims are time-barred by the applicable two-year statute of limitations, and the remainder present

---

14.  See Part C.1.c, Note 20, *infra*, for our discussion of the contractual interference claim.

no dispute of material facts.  Plaintiff's brief neither disputes these arguments nor offers additional clarity as to the specific injuries suffered.  (Doc. 64 at 19).  Because no dispute of material facts exist as to the Section 1983 claims, we will grant Defendants' motion for summary judgment on Count 1.  We address each claim below.[15]

### 1. *Tenure Denial, Salary, and Non-Renewal*

Plaintiff asserts that she was denied the opportunity to apply for tenure in 1997-98 and in 2002-03, and this violated her right to equal protection.  (Doc. 47, ¶ 195). To succeed on this claim, Plaintiff must show that she suffered purposeful discrimination at the hands of the Defendants.  Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992) (Plaintiff must show that she "receiv[ed] different treatment from that received by other individuals similarly situated.").  As discussed in our March 6, 2012 opinion

---

15.  We note that Plaintiff's brief in opposition contains a section titled, "Individual Defendants Acted Together To Deny Plaintiff's Rights of Equal Protection Was [sic] Conspiracy For Individual Liability."  (Doc. 64 at 20-21).  Plaintiff appears to be asserting a Section 1983 conspiracy claim.  In order to properly plead a conspiracy claim, Plaintiff must have made "factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events."  Whitehead v. Rozum, No. 3:11-102, 2012 WL 4378193 at *5 (W.D. Pa. Aug. 7, 2012) (citing Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1994)). "Mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy [Rule 8's] requirements."  Loftus v. Southeastern Pa. Transp. Auth., 843 F. Supp. 981, 987 (E.D. Pa. 1994).  "Plaintiff's bald allegations of conspiracy are insufficient to state a claim . . . ."  Whitehead, 2012 WL 4378193 at *5.  This claim was never pleaded. A Plaintiff may not proceed with summary judgment procedures on a claim that was not pleaded.  "There is no excuse or justification for plaintiff's attempt to fend off summary judgment with a newly asserted claim."  Saini v. Bloomsburg, 826 F. Supp. 882, 890 (M.D. Pa. 1993).  Because the complaint was never amended to include this claim, we find that it was waived.  See Taylor v. Sanders, No. 12-3890, 2013 WL 4010249 at *2 (3d Cir. Aug. 7, 2013).

(Doc. 21), all claims pursuant to Section 1983 are subject to a two-year statute of limitations that begins to run from the moment of a Plaintiff's injury. <u>Kach v. Hose</u>, 589 F.3d 626, 634-35 (3d Cir. 2009). Plaintiff is therefore barred from asserting any claims based on discrete acts that occurred prior to July 6, 2009. (Doc. 21). Because Plaintiff was allegedly denied tenure well before July 2009, this claim is time-barred.

Plaintiff also claims that her salary was lower than her white male counterparts as a result of discrimination. (Doc. 12, ¶ 21). However, Plaintiff agrees that she ceased receiving a salary from Defendants on September 20, 2007. (Doc. 47, ¶¶ 154-158). Accordingly, we find that any claims based on the amount of her salary are time-barred.

Plaintiff asserts that the non-renewal of her appointment in 2007 was the result of discrimination. (Doc. 12, ¶ 62). This claim is also time-barred.

### 2. *Discontinuance of Compensation*

Plaintiff claims that her unpaid appointment as an adjunct faculty member was discriminatory and violated her right to equal protection. (Doc. 12, ¶ 31). While this claim is timely, Defendants correctly note that Plaintiff "has not identified any similarly situated individuals who were treated differently . . . and . . . the record establishes that uncompensated adjunct appointments of this type are common." (Doc. 48 at 17 (citing Doc. 47, ¶¶ 161-162)). Plaintiff admits that she knowingly accepted the unpaid position

in order to remain a thesis advisor to a graduate student. (Doc. 65, ¶ 157). This claim does not present a dispute of fact, and Defendants are entitled to summary judgment.

*C. Title VII (Count 2) and Pennsylvania Human Relations Act (PHRA) (Count 4)*

Plaintiff asserts claims under Title VII and the PHRA for disparate treatment, retaliation, and hostile work environment. Again, because the complaint alleges a myriad of wrongs without tying them to a particular cause of action, Defendants assume that Plaintiff's claims are based on her tenure denial, salary, non-renewal of appointment, and discontinuance of compensation. Pursuant to our March 6, 2012 order, Plaintiff is barred from asserting claims under Title VII based on acts taken by Defendants before September 1, 2006. (Doc. 21). Similarly, Plaintiff is barred from asserting claims under the PHRA that occurred prior to January 1, 2007. (Id.).

As discussed *supra*, to the extent that Plaintiff bases her Title VII/PHRA disparate treatment and retaliation claims on her inability to obtain tenure, those claims are time-barred under both statutes. Also as discussed *supra*, we find no evidence that Plaintiff's unpaid adjunct appointment was the product of discrimination based on her race, color, ancestry, ethnicity, national origin, religion, gender, or protected activity. We will address the remaining timely-filed arguments.

1. *Disparate Treatment and Retaliation Under Title VII/PHRA*

The same legal standard applies to claims under Title VII and the PHRA for the purposes of a motion for summary judgment. See Jones v. Sch. Dist. of Phila., 198

16

F.3d 403, 409 (3d Cir. 1999). To establish a retaliation or disparate treatment claim under both statutes, Plaintiff must show a prima facie case of discrimination. Plaintiff establishes a prima facie case by showing: 1) she is a member of a protected class or engaged in protected activity; 2) she suffered an adverse employment action;[16] and 3) the action occurred under circumstances that could give rise to an inference of intentional discrimination. See Lindsay v. Pa. State Univ., No. 4:06-1826, 2009 WL 691936 at *5 (M.D. Pa. Mar. 11, 2009) (McClure, J.) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)); Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). If a plaintiff presents a prima facie case, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory or non-retaliatory reason for the action. Lindsay, 2009 WL 691936 at *5 (citing Jones, 198 F.3d at 410); Dreshman v. Henry Clay Villa, 733 F. Supp. 2d 597, 617 (W.D. Pa. 2010). If Defendants carry this burden, Plaintiff must then show by a preponderance of the evidence that Defendants' reasons are a pretext for discrimination or retaliation. Lindsay, 2009 WL 691936 at *5; Dreshman, 733 F. Supp. 2d at 617.

---

16. "An adverse employment action 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Lindsay v. Pa. State Univ., No. 4:06-1826, 2009 WL 691936 at *5 (M.D. Pa. Mar. 11, 2009) (McClure, J.).

*a. Non-Renewal of Appointment*

Plaintiff contends that Defendants' refusal to renew her appointment in the Department of Surgery was discriminatory or retaliatory. We conclude that Plaintiff has shown a prima facie case of discrimination and retaliation. First, as an Asian female who practices Hinduism, Plaintiff is a member of several protected classes. Second, Plaintiff suffered an adverse employment action when her position in the Department of Surgery was not renewed in June 2007. Third, the non-renewal of her appointment could give rise to an inference of discrimination and/or retaliation. However, we conclude that Defendants have provided a legitimate, non-discriminatory, and non-retaliatory reason for the dismissal, and that Plaintiff has failed to demonstrate the reasons are pretextual.

Defendants assert that Plaintiff's appointment was not renewed because she could not maintain external funding to support her salary. (Doc. 48 at 29). The parties agree that every faculty member is expected to support some of their salary with external research grants. (Doc. 46-73). Plaintiff's most recent grant that provided salary support was awarded in the year 2000. (Doc. 46-81 (under seal); Doc. 46-9). During academic years 2003-2004, and 2004-2005, Plaintiff had no external funding. (Doc. 46-81 (under seal); Doc. 46-9). Plaintiff did receive a grant that supported 6.8% of her salary in 2005-2006, and 5.1% in 2006-2007. (Doc. 46-81 (under seal)). However, in 2007-2008, Plaintiff's entire salary was paid with Surgery Department funds. (Doc. 46-71, ¶¶ 35, 39; Doc. 46-81 (under seal)).

Additionally, Plaintiff's performance reviews in 2002 and 2004 reveal that her superiors expressed concern with this lack of funding. (Doc. 46-29; Doc. 46-31). In 2004, Dr. Cilley wrote: "[Y]our current position as a full-time researcher is heavily dependent on your ability to secure extramural research funding to support your laboratory and lab personnel." (Doc. 46-31 at 5). For this reason, Defendants contend, Department Chair Peter Dillon decided that Plaintiff's appointment would not be renewed when it ended on June 30, 2007. (Doc. 48 at 29).

Plaintiff denies that she lacked sufficient funding and claims that Defendants' argument on this issue is purely pretextual.[17] She contends that she had other research activity, but presents no evidence supporting her point. In fact, to support this argument, Plaintiff cites to minutes from a 2007 meeting between herself and Dr. Dillon that read, "Dr. Chinoy outlined a number of collaborative efforts with outside investigators. She described these as intellectual in nature *and receives no funding from them.*" (Doc. 64-17 (under seal) (emphasis added)).

Plaintiff next attempts to demonstrate pretext by arguing that five "White Male Scientists who were unable to procure external funding were offered alternate work rather than termination." (Doc. 65, ¶ 177). Plaintiff again fails to cite record evidence supporting this argument.[18] Moreover, the undisputed facts show that three of these

---

17. We are addressing Plaintiff's argument on the proper <u>McDonnell Douglas</u> framework despite Plaintiff's failure to do so.

18. Plaintiff does cite to exhibits but these exhibits do not support the contention.

19

individuals hold tenured positions and cannot be terminated for losing funding. (Doc. 47, ¶¶ 180-182; Doc. 65, ¶¶ 180-182). The other two applied for new positions at Penn State after their termination. (Doc. 47, ¶ 184; Doc. 65, ¶ 184). Nothing in the record suggests that these individuals were re-hired inappropriately. Accordingly, we find that Defendants have asserted legitimate non-discriminatory, non-retaliatory reasons for the negative employment action, and that Plaintiff has failed to demonstrate pretextual actions.

### b. Salary

Plaintiff also claims that her salary was lower than her counterparts because of discrimination and/or retaliation. (Doc. 12, ¶ 49). Plaintiff claims that six male faculty members performed the same job duties but were paid more than she. (Doc. 46-53; Doc. 46-54). In fact, the record shows that only two of these faculty members were more highly paid than Plaintiff. (Doc. 47, ¶ 217; Doc. 65, ¶ 217). Neither faculty member is similarly situated to Plaintiff--one is an IT director, and the other was consistently awarded lucrative grants that supported his salary at nearly 50%. (Doc. 47, ¶¶ 233, 222, 225; Doc. 65, ¶¶ 233, 222, 225). Again, Plaintiff cites no evidence disputing these facts, and provides no evidence of her own supporting an inference that her salary was the result of unlawful discrimination or retaliation. We find that Plaintiff has failed to establish a prima facie case of discrimination or retaliation with regard to her salary.

*c. Contractual Interference*

Plaintiff argues that Defendants interfered with her potential employment contracts at several universities in retaliation for her protected activity of reporting religious harassment. (Doc. 64 at 20). It is undisputed that Plaintiff engaged in protected activity when she filed complaints with the PHRC/EEOC in July 2007. (Doc. 48 at 26 n.3). Viewing the facts in the light most favorable to Plaintiff, Defendants were contacted by prospective employers and following those conversations, Plaintiff was not offered the positions for which she applied. (Doc. 48 at 18-20). Plaintiff has pointed to no evidence of record that anything negative or retaliatory was said by Defendants during these conversations. (Doc. 65, ¶¶ 259-308). Even if Plaintiff had proffered such evidence, it is unlikely that providing a negative reference for an employee constitutes an adverse employment action for the purposes of Title VII. See Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 764 (3d Cir 2004) (defining "adverse employment action" as "an action by an employer that is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'") (internal citation omitted). For these reasons, and given that Plaintiff failed to address these arguments in her brief, we find

that Plaintiff's Title VII retaliation claim does not survive summary judgment.[19] [20]

### 2. *Hostile Work Environment*

Defendants move for summary judgment on Plaintiff's hostile work environment claim. (Doc. 12, ¶ 23). To establish this claim under Title VII or the PHRA, Plaintiff must show that "(1) [she] suffered intentional discrimination because of [her religion]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a

---

19. Plaintiff asserts a Title VII/PHRA retaliation claim against Defendant Grigsby for interfering with her position at the Penn State School of International Affairs ("SIA"). Plaintiff claims that after she filed a complaint with the PHRC in July 2007, Grigsby intentionally "misrepresented that Plaintiff resigned" from Penn State, causing her to lose the position. (Doc. 65, ¶ 282). This would constitute an adverse employment action, because it amounts to a firing. However, the record shows that Plaintiff's prospective position at the SIA was a joint appointment, such that it was contingent upon her maintaining a paid appointment in another academic unit at Penn State. (Doc. 62-4, ¶ 11). Therefore, once Plaintiff's paid appointment in the College of Medicine ended in September 2007, the SIA position was no longer available. Assuming that Grigsby did tell the SIA (in error) that Plaintiff voluntarily resigned, his actions would have had no bearing on the fact that Plaintiff's position on the Council was revoked. Consequently, there is no "causal link" between this "adverse action" and the "protected activity." Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007).

20. In addition to the Title VII/PHRA claim, Plaintiff also claims that this contractual interference constitutes retaliation under the First Amendment. (Doc. 12, ¶ 62). To succeed on a First Amendment retaliation claim, Plaintiff must show "(1) that [she] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007). As discussed *supra*, Plaintiff fails to cite to any record evidence demonstrating that Defendants made retaliatory comments about her to prospective employers. The record also demonstrates that Plaintiff's interviews at several schools went poorly, so a causal connection is lacking as well. We find that Defendants are entitled to summary judgment on this claim.

reasonable person of the same [religion] in that position . . . ." <u>Woodard v. PHB Die</u> <u>Casting</u>, 255 F. App'x 608, 609 (3d Cir. 2007) (quoting <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 426 (3d Cir. 2001)).  "Factors which may indicate a hostile work environment include: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Sherrod v. Phila. Gas Works</u>, 57 F. App'x 68, 75 (3d Cir. 2003).  "[A] litigant has up to 180 or 300 days *after* the unlawful practice happened to file a charge with the EEOC."  <u>National R.R. Passenger Corp. v.</u> <u>Morgan</u>, 536 U.S. 101, 110 (2002).

Plaintiff contends that she suffered a hostile work environment because she was pressured to convert to Christianity between 1995 and 2003, and that in 2003 Dr. Cilley stated that he wanted a white Christian division.  (Doc. 47, ¶¶ 241-249). Additionally, Plaintiff claims that between 2003 and 2005, she was excluded from lunches, meetings, and occasional holiday parties.  Because Plaintiff filed the EEOC/PHRC complaint in July 2007, all of these events are outside the statutory period. Plaintiff has fails to point to any timely act of Defendants that created a hostile work environment.  In fact, Plaintiff fails entirely to oppose the motion for summary judgment on this claim.

### D. Equal Pay Act (Count 3)

The Equal Pay Act prohibits employers from paying their employees differently for equal work on the basis of sex.  29 U.S.C. § 206.  The Act carries a two-year statute of limitations, so Plaintiff's claim is limited to wages received after July 6, 2008.  (See Doc. 21).  Defendants argue that because Plaintiff's compensated employment ended in September 2007, this claim is entirely time-barred.  (Doc. 48 at 35).  Plaintiff responds that her claim continues through December 2009.  (Doc. 64 at 23).  Plaintiff's argument is that she received unequal pay because she was not paid *at all* from October 2007 through December 2009.  Plaintiff knowingly accepted the unpaid position in order to continue advising a graduate student.  (Doc. 65, ¶¶ 157-158).  Plaintiff fails to provide evidence of similarly situated male employees who received pay in similar circumstances.  We find no dispute of fact exists to suggest that Plaintiff's unpaid adjunct position violated the Equal Pay Act.  Additionally, we find that the remainder of her Equal Pay Act claim is time-barred.

### E. Title IX - Education Amendments Act (Count 5)

Title IX of the Education Amendments Act of 1972 prohibits federally funded educational institutions from discriminating on the basis of sex.  20 U.S.C. § 1681.  Plaintiff is barred from pursuing this claim with respect to acts that occurred more than two years before this action was filed, or before July 6, 2009.  (Doc. 21).  From July 2009 until December 2009, Plaintiff's only relationship with Penn State was as an unpaid advisor.  Plaintiff states that "[t]he disparate treatment continued under [sic] the last day

24

worked December 2009." (Doc. 64 at 28). However, Plaintiff cites no evidence in the record to support this claim, and we can find none. As discussed in Parts B and D above, we find nothing inherently discriminatory about Plaintiff's unpaid appointment. Defendants are entitled to summary judgment on Count 5.

### F. Tortious Interference with Contractual Relations (Count 6)

Plaintiff claims that Defendant Grigsby is liable in tort for interfering with twelve of her potential employment contracts, and three research grants. Only four of these claims are timely.[21] Defendants argue that summary judgment is appropriate as to these claims and Plaintiff's brief fails to address any of Defendants' arguments.[22]

To succeed on a contractual interference claim under Pennsylvania law, Plaintiff must show: (1) the existence of a prospective contract; (2) Defendants'

---

21. The following claims are time-barred because the alleged injury occurred prior to July 2009: Plaintiff's rejection from a position at the University of Iowa in September 2006 (Doc. 47, ¶ 262); rejection from George Mason University in March 2007 (Doc 47, ¶ 268); rejection from James Madison University in March 2007 (Doc. 47, ¶ 272); rejection from Massachusetts General Hospital in 2008 (Doc. 47, ¶ 283); rejection from Johns Hopkins in July 2008 (Doc. 47, ¶ 286); rejection from Marywood University in May 2009 (Doc. 47, ¶ 289); rejection from a position as Penn State Associate Dean for Undergraduate Education in April or May of 2007 (Doc. 47, ¶ 277-278); removal from the Penn State School of International Affairs Governing Council in October 2007 (Doc. 47, ¶ 310); termination of Plaintiff's grant work with the World Cocoa Foundation in October 2006 (Doc. 47, ¶ 316-320); and denial of research grants from the Woodward Foundation and HED in 2006 (Doc. 47, ¶ 316-320).

22. The only claim that Plaintiff discusses in this section of her brief is against Defendant Grigsby with regard to the position at Penn State's School of International Affairs. (Doc. 64 at 28-29). Because this tort carries a two-year statute of limitations, and this injury occurred in 2007, that claim is time-barred. For the sake of thoroughness, we will address the remaining contractual interference claims as raised by Defendants.

intentional interference with this contract without justification; and (3) that this interference caused damages. InfoSAGE, Inc. v. Mellon Ventures, L.P., 896 A.2d 616, 627 (Pa. Super. Ct. 2006). "[T]he central inquiry is whether the defendant's conduct is 'sanctioned by the rules of the game which society has adopted.'" Phillips v. Selig, 959 A.2d 420, 435 (Pa. Super. Ct. 2008) (internal quotations omitted). A person is not liable for this tort if they give a third person "(a) *truthful information*, or (b) honest advice within the scope of a request for the advice." Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc., 982 A.2d 94, 98-99 (Pa. Super. Ct. 2009) aff'd, 20 A.3d 468 (Pa. 2011).

Plaintiff applied for a position at Central Michigan University ("CMU") in early 2010. She claims that CMU contacted two individuals who work with Defendant Grigsby, and that she was subsequently rejected from the position. (Doc. 65, ¶ 292). Plaintiff also applied for a position at Boston University ("BU") for which she was not selected. While Plaintiff does not know if anyone from Penn State spoke with someone at BU, she claims that Defendant Grigsby knows the Dean of BU, and she opines that he interfered. (Doc. 65, ¶ 299). Similarly, Plaintiff claims that her application to the University of New England was thwarted by Grigsby because he has access to its hiring personnel, through his position with the American Association of Medical Colleges. (Doc. 65, ¶ 303). Finally, Plaintiff claims that Grigsby asked a subordinate to contact someone at Arcadia to interfere with that application as well. (Doc. 64-12).

Plaintiff seeks to hold Defendant Grigsby liable in tort because he presumably provided negative references to her prospective employers. This claim fails

for several reasons.  First, Plaintiff has pointed to no evidence of record indicating that Defendant Grigsby did, in fact, communicate with these prospective employers, and what, if anything, was said.  Mere speculation by Plaintiff that Defendants interfered is insufficient to support her claim.  Moreover, records from BU and New England indicate that Plaintiff's interviews at both schools went poorly.  (See, e.g., Doc. 46-60 (noting that Plaintiff was "[n]ot a candidate[,]" and "[s]he does not seem right for this position.")).  Because no reasonable juror could find for Plaintiff, we will grant Defendants' motion for summary judgment on the timely-filed contractual interference claims.

> ## V. Conclusion

For the foregoing reasons, we find that Defendant is entitled to summary judgment on all counts.  We will issue an appropriate order.